And we'll turn to Eisner against Eros International plc Mr. Goldsmith, go ahead. Thank you, your honors. Good afternoon. May it please the court. My name is David Goldsmith for the appellant lead plaintiffs in this securities fraud class action. Your honors, when Eros, the company in this case announced that Eros now, what it termed its online entertainment platform offering full length movies, had tens of millions of what they called registered users, who included, quote, free, transactional and premium users, reasonable investors understood that such registered users were not only registered with the Eros now service, but were also able to actually use the service in order to watch those full length movies. And that, your honors, is really the core issue that's before this court in reviewing the complaint. If they had said 30 million subscribers, you wouldn't have a case. I think we For 30 million members, you wouldn't have a case. I think we would have a case, your honor, considering that the service didn't work. I think there's the problem is that the service didn't work. And when you talk about Well, wait, the service worked if you had the right kind of equipment to use it, right? Well I mean, they did, they could stream movies. It's not the problem isn't on their end. The problem is on the user's end, that if you went and signed up, and even if you paid money for premium service or whatever, if you hadn't bought your computer yet, you couldn't use it. The problem, your honor, is that in India, where the vast majority of the registered users were located, because this was an Indian company, of course, as we understand it, very few of the users proportionally were outside of India. The state of technology in India in terms of broadband and such were not of the level that would permit that most people in India would not be able to use the service with the kind of equipment that most people in India have, which apparently was early generation type cell phones that didn't have the current kind of capacities that we take for granted. Correct, your honor. Right. They had dumb phones, and you had 2G predominantly, and so you couldn't use it. And the world knew that, or could know that. The world did not know that, or at least there's no indication that the world did know that, because when... It's a secret that what kind of cell phone service is available in India? Well, what I can say, your honor, is that they did an IPO at the stock exchange here, which was successful. And then when word got out... But they said in their prospectus that their ability to do anything effective and make any money depended on future technological developments. And they stated in the very paragraph that you quote, though you didn't quote these words, that most of those users had a WAP access to the system. Right? That, what they were referring there, your honor, were people who came from TechZone. TechZone was this other value-added service that was acquired sometime early in the classroom. That's where, at one point, they got 10 million of, at that time, the 14 million people that they were claiming. Right. So that's kind of important, that this is what those 10 million people had. Right. But here's the problem. So they said that they successfully converted those 10 million people to be Eros Now registered users. They did. They signed up. No. They didn't. They bought that customer, as we allege, your honor. They bought that customer list and bought the right to market Eros Now to these customers. I did not think that, maybe I'm mistaken, I thought that, at least in this court, you were no longer alleging that they did not have those people actually signed up. That is to say, when they say they had 30 million people, I thought you were not contending that they didn't have 30 million people actually signed up. You are only contending that those 30 million people, the vast majority of them, could not actually make effective use of the streaming service. We are alleging, no, we are alleging that the 30 million people couldn't use the streaming service. We're also alleging that the 30 million number is inflated because 10 million, approximately, of those people are Tech Zone customers who were using a different platform that was owned by Eros, but which, we allege, was siloed and an incompatible platform to the Eros Now platform. So you're saying they falsely stated they had successfully converted those members because none of those members actually said, yes, I'm signing on the dotted line, I want to be an Eros customer. They may have done something, Your Honor, like provide an email address or their WAP mobile number, but in addition to the siloed nature of the platforms, for the same reason that we allege that the, that the person in India- Yes, exactly. That because if they had a WAP, they could not actually stream a movie. That's the heart of your contention. Right. So it's, so for the 10 million- But it's disclosed that they had a WAP connection, and all you'd need to do would be to look that up and find out what it means to figure out that they couldn't, in fact, make use of the streaming service. Is that not correct? It is not, Your Honor, because at the same time, they're saying that those people were successfully converted, and the analysts who are reviewing this information, like, like Jeffries and, and Wells Fargo, who were the chief analysts that were reviewing this information, were talking about next step monetization, they were talking about gaining increased subscribers. They seem to have no concerns over the, over the representations that were being made. Did that eventually happen, by the way? I'm sorry, sir? Did that, that eventually happen? Did that eventually happen? Yes. Well, I don't know exactly all of the facts post the class period. I mean, it is my understanding that the Eros Now service is continuing. I don't know what the state of technology in India is today. It's probably better than it was during the class period. I would, I would, you know, I would, I would, I would presume that, that, that, that would probably be a fair contention. But at the time, it was not. And when the October 2015 Wells Fargo report came out, where Wells Fargo was having some real concerns about the nature of the, of the user list, the stock dropped 17 percent, which is a particularly material amount, because Eros wasn't making a great deal of revenue compared to the entire Eros company. Eros Now was only one part of the company. The company was a large Bollywood movie studio, and Eros Now was only one part of it. So, the, the, the, the successful conversion, I think, is, is a material fact that needs to be considered. One other part that I would notice is that in the, in the brief that the defendants filed here, they contended that TechZone was acquired in February of 2015, and that it was also, it was on February 17th of 2015, where the CEO claimed that these ten million people were successfully converted. So, I think it's interesting that they would sign a contract to purchase the TechZone company sometime in February of 2015. I don't know what date. They didn't disclose the date. And then on February 17th of 2015, they would say that they had successfully converted ten million. What would it take to be a user in, in your definition? Suppose it turned out that everybody signed up for the service, and then it also turned out that, for whatever cultural reason, most people in India, like me, would rather see a movie on a big screen than look at it on a cell phone. They didn't like the service, and they never used it again after checking in once on the thing to see what it would look like. Well, I don't know if it's... Would that be, would they not be users? They would be users if they could use it and simply didn't like it, but I don't think it's a question, Your Honor, of, of market interest. People who could use, people who could use are users, registered users. If they registered properly and they had technological access, but like many people, they signed up for an app where they were a TechZone customer and they said, eh, it might be something I'll sign up for. Maybe I'll look at it someday. And they never do. Those would still be registered users, in your view. But if they lacked the right, if they lacked a hardwired Fios connection in their house on a PC, but only had a cell phone, they wouldn't be registered users. Is that the idea? I think that is, is, is part of the idea, but... Now, it's my impression that Facebook and Twitter and people like that use terms like for monthly active users when they report on their customer base. And I had, was under the impression that that was a term of art in the social media world. Is registered, you, you said that registered users in your brief was a term of art. I didn't find that defined that way in the, I think it was a Wikipedia citation that you gave. Is there anything else that says that registered user is a generally understood term of art in the streaming industry or whatever kind of industry? Well, you know, if I use the term of art, I don't recall using that term, term of art. But the only, the only cases where, where I had found the term and, and defendants can disagree were in patent cases. But, but the, the point is that the defendants were talking about monetization. And here the defendants argue that registered user had nothing to do with monetization because it's something they were going to do in the future. But you can't monetize until you have a base of users that are using the system for free and are able to, to use it. You have a loyal base of users that are using free and ad supported content who are actually there and, and using the system and getting a benefit from it so that you can then entice them to sign up and pay, pay subscription fees every month, which was the, the Netflix model. But if you're already, if you're already supported by advertising, you have monetized them because you've, you've just had a different business model. You've sold the customers to the advertisers rather than selling your service to the customers. But that's not what they want to do, Your Honor. The, the, the idea there, the idea with Eros now was to start by, by getting, by selling ads, by getting, enticing people to sign up for free to get ads, and then they would hopefully entice people to sign up for premium service and pay a certain amount of money per month. That was where, that's where the money is. So, so a registered user didn't imply that the, that the, that the user would actually pay any money to Eros. It, it, it, it implies, I think, to the market that you could actually use the service and it wasn't, and you didn't just necessarily sign up for something that you couldn't, couldn't use. That's, that's, that's... But if it was free, if you didn't have to pay, you might sign up for it. You might sign up for it, and that's something that you'd want to be able to, to use, Your Honor. I mean, I think, I think it's, I think it's, you know, implied, especially when you're talking about in the same breath, in your IPO perspective, that this is a service that offers full-time, or full-length, excuse me, movies. I mean, in, in November of 2004, the CEO spoke to the U.S. market and called Eros now the, I believe it was the Netflix meets Hulu meets Spotify meets iTunes of Indian content. The CEO didn't say, well, we're just getting off the ground, and we don't really have very good technology yet in India, so you can sign up, but it's not really going to be available for a few years, so we just want to let you know. Could have said all of those things. Thanks, Mr. Goldsmith, very much. You reserve some time.  Good morning. May it please the Court. My name is Stephen Tauntas. I'm counsel for the appellees, Eros, and the individual defendants in this matter. This matter is a very simple one, as Judge Nathan very succinctly stated in her thorough decision. It boils down to one simple claim, that a person cannot be a registered user if he or she cannot meaningfully make use of the product. You heard a lot from my colleague on the other side this morning about what this company is. Let me take a step back. It is not, certainly not at the time of the IPO, a company that launched on the merits of Eros Now. It's a company, actually, which produces, acquires, and distributes theatrical content, and that is why people invested in this company at the time of the IPO. Eros Now was one product that was for the future, which was highlighted in the IPO, and as we'll discuss in a moment, the company was always very clear that it was going to take quite a bit of time for the technology in India to get to where it needed to be in order for this product to be monetized. What can I ask you, what were you intending to convey by saying registered user? What, what, what, why did you use that phrase? Judge Corman, the phrase registered user speaks for itself. It's someone who registers for the service. If we wanted to call them active users, we would have called them active users, and I think what was said time and time again about the growth of registered users, it was crystal clear that the predominant number of people that were registering for the service were not only in India, as Judge Lynch recognized, but also were using the WAP or W-A-P protocol, which anyone with Google would have known was behind the times and was not exactly like using an internet terminal on your PC. If you look at the statements that were made here, they have nothing to do with the meaningful use of Eros Now. February 27th, 2015, right after the Tech Zone acquisition that my colleague focused on so, so closely, the company reported 14 million registered users. Now what my colleague didn't say is that there was a step further, not just free premium and transaction, but also that 10 million of these people are from Tech Zone. Not only are they from Tech Zone, they're from India, and they are on WAP. And beyond that, less than 1% of the total user base is paying for the service. I didn't hear that from him at all, and it's actually not in their brief. So we were crystal clear at the inception of announcing this transaction, most people are free users, and they're behind the times when they're using the technology because they're asking from WAP in India. There's also another key thing that was disclosed during that conference call, which gives key context to what people were doing to use this service in India. The CEO specifically disclosed on the earnings call that the Eros Now platform was also being used by WAP users to purchase ringtones on the Eros Now platform. And that was something that was actually credited by Judge Nathan during her decision to recognize that even if someone couldn't stream a full-length movie, there were other things they could be doing with the service. In June 10th of 2015, Eros grew its product size for Eros Now to 19 million registered users. And once again, it was crystal clear of this 19 million, 15 and a half of those registered users were in India. Once again, the CEO also reconfirmed less than 1% were premium users, the ones who were paying a monthly fee for the service. And needless to say, 15 and a half million of the people are in India. There are other people outside of India with the appropriate technology to still use the service. The service worked. This is not a consumer fraud dispute, this is a securities fraud dispute. Going a step further, August 18th of 2015, the size of the registered user base grew to 26 million registered users. Once again, and this is something that is completely glossed over, I heard from my friend that the company never said, well, technology needs to catch up, we need to get there. During this earnings call, the CEO was explicit. She told investors that in order to increase the number of premium users, and I quote, 4G growth has to happen, broadband has to happen. So the user experience is not just a function of all the cool things we do, it's a function of broadband and bandwidth. And that's because as anyone knew, who was looking at this product at the time, with the majority of users being in India, the technology had to catch up. Let me touch on Tech Zone for a moment, because I think that's an important part of my colleague's argument. They originally argued that we had overstated their user count, and I'm not going to get into that at length today, because it's not part of their operative pleading at this point. But what they're saying now about Tech Zone actually doesn't reconcile at all with the operative pleading. My colleague is claiming somehow we commingled and padded and potentially inflated the number of registered users by pointing to this Tech Zone transaction, which he claims was acquired, you know, a week or so before this key earnings call. Well, the problem for my colleague is paragraph 248 of his operative pleading specifically acknowledges that Tech Zone actually had 40 million customers at the time of the acquisition. So by announcing that 10 million of the 14 are Tech Zone, that's showing a conversion rate of 25%. It's not showing a conversion rate of 100% by just lumping them all in and say, hey, guess what, guys? We just got, you know, 10 million new users, so we just signed up this Tech Zone thing. It actually, and it's reflected in his pleading, was part of a year-long marketing campaign, a systematic marketing campaign, in which Eros approached Tech Zone users. They did acquire the right to approach them as part of this transaction, and they systematically marketed it. And as the CEO explained during that earnings call, it was a two-step process. This was not an automatic conversion. It took quite some time. It was not, you know, a flash in the pan, four or five-day increase of 10 million registered users. More importantly, Your Honor, I just want to hit briefly on the revenue point, because unlike most securities fraud cases, this has nothing to do with an instance where a company is accused of cooking the books, although at one point in time, the class action did claim we cooked the books, but that's no longer at play here. This is a case where the appellants are trying to give the misimpression that Eros now is the principal revenue driver of the company. And as I explained earlier, it was not the principal revenue driver at the time of the IPO. It was not even the principal revenue driver at the end of the class period. The company was crystal clear when it disclosed that only 1% of the registered users were paying for the service. And they were also crystal clear in November of 2014 when they acknowledged it would take at least a couple of years to monetize the service. Again, that's November of 2014. If you extrapolate that by the at least a couple of years, you're at November 2016. Guess what? That's after the class period. It's a year after the class period. There were full disclosures at all points. This was not generating revenue for the company during the class period in any type of material way. It was not the principal revenue driver. On the topic of omissions, the appellants argue that the company failed to warn of the risks regarding the technology and the fact that the registered users couldn't make meaningful use of the service. I frankly don't understand this argument. First of all, in this court, there is no right of self-confession. Second of all, you don't need to just disclose every little thing just because you think someone might be interested in it. Unless you've given an affirmative statement that requires more disclosure, you're not required to say more. But here, we actually did say more. We included disclosures like the one I mentioned a moment ago where the CEO explicitly said we need growth of 3G, 4G to happen. We need broadband. We need bandwidth. We also had explicit risk disclosures, which at every single turn, including in the IPO, specifically disclosed that the state of technology would be a potential impediment for the success of certain products, including Eros now. I'd also like to just briefly touch upon loss causation, Your Honor. You know, it's not a part of the appellant's operative appeal here, but my colleague did mention the 17% stock drop from the Wells Fargo report. So we did put it in our papers. I'm going to very briefly mention it. The 17% drop from Wells Fargo had to do with a whole host of issues, none of which really had to do with Eros now. The Wells Fargo report on its face deals with many issues, including free cash flow, including accusations that the company was potentially being left behind with some of its competitors. And frankly, that thing was occurring at a time when the company was under a hostile attack by short sellers. The alpha exposure reports, which were the centerpiece of this case until it went on appeal, were anonymous blog posts by a short seller. That short seller has now been unmasked. We know who that is, and we're proceeding that action in a separate court. The loss causation for the purposes of this case, the 17%, the stock price actually bounced back the lion's share of it the next day. That's all I have. Unless there are further questions, I'll cede the rest of my time back to the panel. Thanks very much. Thank you. Mr. Goldsmith. Thank you, Your Honors. I would note that in becoming the first Bollywood company to do an IPO in the United States, Eros Now was absolutely considered the main event for the company. If you look at, in our complaint, the initial reports of Macquarie Capital and Wells Fargo in initiating their coverage of the company, they both said that the investor interest was clearly focused on Eros Now. That was why investors were interested in the company. If you look at the investor day on October 13, 2015, two years after the IPO, which was the first ever analyst and investor day hosted by the company, Wells Fargo said that investor focus was clearly and squarely on Eros Now. The whole focus of the IPO and investor interest here in the United States was the Eros Now service. And the reason for that was that unlike Netflix, they had their own library of films. So analysts and investors were excited that they didn't have to buy content and they could simply show their own movies. So to suggest that Eros Now was this small, you know, sort of small part of things is not consistent with the facts as alleged in our complaint. Tech Zone, the Tech Zone platform was siloed from the Eros Now platform. We have detailed allegations in the complaint that come from a confidential witness who was close to this and set it all up. That's all I'll say about that. The 1% issue, Ms. Desponde, the CEO, specifically walked back those remarks in June of 2015. She had said something on that point, as Mr. Taunta said, in February of 2015 and then in June of 2015, she was asked questions about that. And she specifically walked that back and said, essentially, I didn't mean to say that. And she said that actually 1% of paid subscribers would be wonderful at this point in time. One thing I do want to mention is Judge Nathan's comment in her opinion on SPA page 9 of equal plausibility. The district court took an approach that the definition that the court found of registered user would be equally plausible to the definition that was alleged in the complaint, which was supported, of course, by Eros' business plan and supported by the analyst community's reaction to the misstatements. Plausibility, Your Honors, is not a comparative inquiry. Sienta is, but Sienta is not before this court. Plausibility is simply a matter of alleging a plausible theory. You don't have to allege the best theory. You don't have to allege the only plausible theory. You don't have to allege alternative plausible theories. You only have to allege a plausible theory. And we submit that we have done so. We think it was error for the district judge to say that an equally plausible theory should negate our plausible theory. Thanks very much. Thank you. We'll reserve the decision. Thank you. Well argued by both sides.